Jasen, J. (dissenting).
I take no issue with Chief Judge Breitel’s exquisite analysis of the law of consent. My diffi *132 culty is, rather, with the application of the law to the particular circumstances of this case and with the conclusion reached by the majority that "on no view of the evidentiary facts was there an exercise of free will in the giving of the consents” (p 124). In my view, there is a rational and reasonable view of the evidentiary facts which would support the finding of the trial court that the defendants did voluntarily consent to the search of their apartment. Even more fundamentally, I believe that, absent consent, the search was valid pursuant to our recent decision in People v Clements and Metzger (37 NY2d 675, cert den 425 US 911).
On September 17, 1973, defendant Joseph Gonzalez sold a quantity of cocaine to a Federal undercover agent, Michael Horn. The sale was transacted in the bedroom of Gonzalez’ New York City apartment. Agent Horn testified, at the suppression hearing, that Gonzalez removed a clear plastic bag containing approximately two ounces of a brown crystalline powder from a coat hanging on the bedroom door. Gonzalez put the bag on the top of a bedroom dresser and placed a sample of the substance in another bag which he then gave to Agent Horn. The defendant’s wife, Tracy Gonzalez, was seated on the bed and witnessed the entire transaction. Horn left the apartment, only to return 15 minutes later in the company of another agent, Hochman, for the purpose of arresting both defendants. When the agents arrived at the apartment, Joseph Gonzales was standing in the hallway outside his apartment. The agents displayed their badges, produced their weapons, and told Gonzalez that he was under arrest. Although the defendant later denied knowing the reason for the arrest, he conceded, under questioning, that he "had a pretty good idea”. The defendant lunged at Agent Hochman and the men wrestled with each other as they fell down a flight of stairs. As he fought with the agent, Joseph Gonzalez screamed to his wife to lock the door. Agent Horn and a third agent, who had entered the building in response to the sounds of the struggle, went to Agent Hochman’s assistance. The three men eventually subdued the defendant and led him back up the stairs to his apartment. The agents banged and kicked the door for several minutes, while telling Mrs. Gonzalez that she was under arrest. Mrs. Gonzalez was using this time to flush the cocaine from the two-ounce bag down the toilet. When she was through, she opened the door to the agents. The three men, the defendant, and other surveillance agents entered the *133 apartment. Agent Horn arrested Mrs. Gonzalez, placed her in handcuffs and brought her into the bedroom. The agent noticed that the bag of brown powder was no longer in the bedroom. The other agents "conducted an eyeball search of the apartment for other bodies”. In the course of this search, which is routinely done to be sure that no other persons are hiding in the immediate area, the agents opened closet doors to "see if anybody [was] in a closet”. A couple of other agents were outside checking an alleyway in the event that some contraband had been thrown out the window. Another group was outside the apartment reassuring neighbors who had been disturbed by the altercation in the hallway. Defendant Joseph Gonzalez was detained, handcuffed, in the living room. Mrs. Gonzalez’ mother and grandfather were permitted to enter the apartment. The mother went into the bedroom and talked with her daughter for a few minutes. The grandfather "was walking all over” the apartment, so the agents asked him to leave. They also "requested that her mother leave the apartment. She could say what she had to say and [then] it was time to leave.” The agents told her "where her daughter would be, where they were to be arraigned and what she was being arrested for and asked them to leave the apartment.” After these visitors left, the defendants were read the now standard preinterrogation warnings (Miranda v Arizona, 384 US 436) and were asked to sign forms consenting to a search of their apartment. These forms included a warning that fruits of the search could be used against them and that the defendants need not consent. Both defendants signed the form. After the form was signed, the defendants were taken to a police station. Other agents began to search the apartment. They found 52 grams of cocaine hidden under some sweaters in the top shelf of the bedroom dresser. Another gram of cocaine was found in the bedroom sink. Less than a gram of marijuana and a quantity of syringe needles were found on the top of the bedroom dresser. Another half gram of marijuana was discovered in a closet. After completing the search, the officers locked all the doors and closed all the windows. As they left the apartment, they found Mrs. Gonzalez’ grandfather waiting outside the apartment. He claimed he had stopped by because he was worried that the police would leave the apartment door unlocked when they left. The officers gave him the key to the apartment and left the building.
The defendants contend that the agents, to induce them to *134 sign the search consent form, made a wide variety of direct and implied threats against them. Joseph Gonzalez testified that the officers told him that unless he co-operated with them, he would be sent to prison for life and would never see his wife again. He also claimed that the officers physically threatened him. "They didn’t come right out and say they’d hurt me. They said it in a round-about way.” Tracy Gonzalez claimed that similar threats had been directed at her. She alleged further that the officers had searched the apartment prior to obtaining the consent and had pushed her relatives out of the apartment. Contrary to the implication in the majority opinion (p 126), the officers denied these accusations in their entirety. For example, Federal Agent Horn was asked if he, at any time, had threatened to prosecute Tracy Gonzalez in a State court. The court limited the question "to the events of that evening in the apartment and as amended, you may answer that.” The officer responded, in accordance with the court’s limitation, "Not in the apartment”. This response was not a negative pregnant designed to give a false impression. Rather, the officer’s answer was in full compliance with a limitation that the court imposed upon the question, a limitation that the defense did not object to.
I cannot agree with the court that "on no view of the evidentiary facts was there an exercise of free will in the giving of the consents” (p 124). As I view the facts before us, there is evidence upon which the court could find, as the trial court did, that the defendants willingly consented to a search of their apartment. The record discloses that the consent was not given until after Tracy Gonzalez disposed of the drugs that she and the police had known to be in the apartment. The defendants do not contend that the agents actually abused them, either physically or verbally. A careful reading of the transcript of the suppression hearing discloses that the testimony of the various officers is consistent and credible, while the versions proffered by the defendants vary and are cluttered with contradictions and asserted lapses of memory. Thus, there is support in the record that at the time the consent was executed, the atmosphere in the apartment was relaxed and the defendants were cool and rational. The Appellate Division did not question the veracity of the agents. Nor did the court find any evidence of overbearing police conduct. Rather, that court refused to accept, as a matter of law, the fact that defendants, faced with the possibility of a mandatory *135 life sentence, would voluntarily consent to a search of their apartment. (46 AD2d 882, 883.) I cannot accept this reasoning. Defendants, caught with the goods, might well imagine that co-operation with authorities might earn them at least a small measure of leniency, whereas an obstinate refusal in the face of harsh reality would serve little purpose. Moreover, the defendants offered several conflicting claims at the hearing as to why they had signed the consent form. One of their claims was that they had signed the form because the agents told them that they would obtain a search warrant if the defendants had refused to sign the form. Assuming that the statement was made, it would not affect the voluntariness of the consent since there was sufficient evidence to justify the issuance of a warrant. (See United States v Miley, 513 F2d 1191.) Upon this evidence, I believe that the trial court could properly find that the defendants did voluntarily consent to the search of their apartment, and that it cannot be said, as a matter of law, that there is no view of the evidence to sustain such a finding.
Even, if we were to assume, as a matter of fact, that the consent was given involuntarily, I do not believe that the fruits of the search should be suppressed. As the majority concedes, the agents certainly had probable cause to search the apartment. A narcotics agent had purchased drugs from the occupants of the apartment and had observed, only fifteen minutes earlier, that a large quantity of drugs was stored in the apartment. If the agents had applied for a warrant, their application would surely have been granted (p 131). However, the agents did not have the time to obtain a warrant. Agent Horn testified that, while he was purchasing the sample from Joseph Gonzalez, Gonzalez felt the agent’s gun and became extremely nervous. The defendant already knew that his "connection” had refused to deal with the undercover agent. Thus, the agent had a valid ground for believing that, once he left the apartment, the defendants might well destroy the drugs or remove them from the premises.
In People v Clements (37 NY2d 675, supra), we were confronted with a similar situation. An informer had agreed to make a buy for the police and had told the police that bricks of marijuana were kept in the bottom drawer of a dresser in a particular apartment. The informer made the buy, but reported that the sellers had become suspicious. The officers went to the apartment, arrested the sellers, and saw mari *136 juana in open view. They proceeded to the location of the dresser, as described by the informer, and found the bricks of marijuana the informer had said were there. We held the warrantless search to be valid. We noted that the police might have sealed off the defendants’ apartment while a warrant was obtained. However, this would have involved an intrusion of greater magnitude than that engendered by an immediate search. We concluded that "a fair or sensible balancing of the competing private and public interests” did not demand that "the greater intrusion be preferred over the lesser.” (37 NY2d, at p 681.)
In my view, Clements is fully applicable to this case. The police had probable cause to arrest Gonzalez and his wife and to search their apartment for drugs. The arrest had to be made quickly for Gonzalez had become nervous about the identity of the undercover agent. Once having arrested Gonzalez, there was a grave danger that the drugs would be disposed of before a warrant could be obtained. Indeed, the defendant’s wife, immediately upon the arrest of her husband, flushed the previously observed cocaine down the toilet. Her grandfather was found waiting outside the door when the police concluded their search. "In sum the situation was sufficient to create, and evidently did create, a perceived likelihood” that the narcotics which the police knew to be in the apartment "might be destroyed”. (People v Clements, supra, at p 680.)
I would reverse the orders of the Appellate Division, sustain the validity of the search, and reinstate the judgments of conviction.
Judges Gabrielli, Jones, Wachtler, Fuchsberg and Cooke concur with Chief Judge Breitel; Judge Jasen dissents and votes to reverse in a separate opinion.
Orders affirmed.